**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| JAMES R. SMITH, | Case No. EDCV 16-2643 SS |
| Plaintiff, | |
| v. | |
| | **MEMORANDUM DECISION AND ORDER** |
| NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration, | |
| Defendant. | |

**I.**

**INTRODUCTION**

James R. Smith ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner" or the "Agency") denying his application for Disability Insurance Benefits and Supplemental Security Income. The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge.

(Dkt. Nos. 14-15).  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for Title II Disability Insurance Benefits ("DIB") and an application for Title XVI Supplemental Security Income ("SSI) on May 13, 2013. (Administrative Record ("AR") at 43, 144-53).  He alleged a disability onset date of June 1, 2012.  (AR 43, 145).  The Agency initially denied Plaintiff's applications on November 25, 2013, and upon reconsideration on January 24, 2014.  (AR 83-86, 89-93). On February 21, 2014, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 94-95).  Plaintiff testified at a hearing before ALJ Mark Greenberg on May 18, 2015 (the "ALJ Hearing").  (AR 27-42).  On July 23, 2015, the ALJ issued a decision denying disability insurance benefits and supplement security income.  (AR 10-26).  Plaintiff filed a request for review of the ALJ's unfavorable decision on September 14, 2015, which the Appeals Council denied on October 27, 2016.  (AR 1-5, 8-9).  Plaintiff filed the instant action on December 27, 2016.

\\
\\
\\
\\
\\

Plaintiff was born on October 19, 1954. (AR 144). He was 58 years old as of the alleged disability onset date of June 1, 2012, and 60 years old at the time of ALJ Hearing. (AR 29, 144). Plaintiff did not graduate from high school but he has a GED. (AR 29-30). Plaintiff was unemployed at the time of his alleged onset date. (AR 30). Plaintiff was last employed by Powerstride Battery Co. as a regional sales representative until August 11, 2011, when he was "laid off for lack of work." (AR 30, 164, 179). Plaintiff's earnings record indicates that his last-insured date was December 31, 2016. (AR 154).

Plaintiff listed his illnesses as atrial fibrillation and degenerative lower lumbar spine. (AR 145, 179). The record indicates Plaintiff was first diagnosed with atrial fibrillation on July 21, 2012, when he was hospitalized due to a seizure and a rapid heart rate. (AR 338, 352). Plaintiff first sought medical attention for back pain on April 8, 2013. (AR 299). Plaintiff is prescribed Digoxin, Diltiazem, and Metoprolol Tartrate for his heart condition and Hydrocodone Acetaminophen and Norco[1] for his back pain. (AR 251-52).

\\

\\

---

[1] Norco is a brand-name combination of hydrocodone and acetaminophen. See MEDLINEPLUS, https://medlineplus.gov/druginfo/meds/a601006.html (last visited July 24, 2017).

## A. Medical History And Treating Doctors' Opinions

### 1. Treatments For Seizures, Atrial Fibrillation, Chronic Obstructive Pulmonary Disease, Congestive Heart Failure, Hypertension, and Hernia

Plaintiff first sought medical attention for seizures and atrial fibrillation on July 21, 2012, when he was admitted to the emergency room of Desert Regional Medical Center. (AR 338, 352). On July 21, Plaintiff suffered a seizure and called an ambulance. (AR 352). The hospital records also indicate that Plaintiff began experiencing a rapid heart rate the day before. (AR 338). Upon being admitted, Plaintiff initially reported that he was drinking the day prior, but later indicated that he quit drinking two to three weeks ago. (AR 349). Plaintiff specified that he drank a pint of vodka every day for 25 years. (AR 352). Plaintiff has also been smoking a pack of cigarettes a day for the past 40 years. (AR 349).

Plaintiff remained at the hospital for four days during which time doctors performed various tests. (AR 331). Plaintiff was diagnosed with "[n]ew-onset atrial fibrillation, alcohol abuse, [and] thrombocytopenia likely secondary to alcohol use." (Id.). During the hospital stay, "[e]xtensive time was spent discussing. . . alcohol cessation" and Plaintiff was "instructed to try to seek help and remain sober from alcohol." (Id.). Upon discharge, Plaintiff's heart rate and condition was stable. (Id.).

The record suggests Plaintiff's condition was stable between the July 21, 2012 incident until September 2014. During that time, the record reflects only two medical clinic visits, both for prescription refills. On September 4, 2012, Plaintiff visited Kerrigan Family Medical Group to obtain refills for his medication. (AR 295). The progress notes indicate that Plaintiff's atrial fibrillation was controlled, his COPD was stable, and his alcoholism was in remission. (AR 297-98). Next, Plaintiff visited Borrego Health Cathedral City ("Borrego Health") for prescription refills on September 12, 2014. (AR 435). During this visit, Plaintiff reported that he was not using alcohol but smoked cigarettes every day. (AR 436). Plaintiff received counseling on quitting smoking. (Id.).

About two weeks later, on September 26, 2014, Plaintiff was hospitalized due to chest pain. (AR 336). During the consultation, Plaintiff reported that he was drinking alcohol when he developed chest pain, which prompted him to go to the emergency room. (AR 345). Plaintiff further reported that "he drinks half a pint to 1 pint a week of alcohol" and smokes four cigarettes a day. (Id.). Plaintiff was diagnosed with "chest pain; chronic atrial fibrillation; chronic obstructive pulmonary disease, stable; congestive heart failure, stable; hypertension, stable; tobacco abuse; alcohol abuse." (AR 328). Plaintiff's condition was stabilized and he was again "strongly advised [to] quit smoking [and] stop alcohol intake immediately." (AR 346).

Plaintiff was admitted to the emergency room for chest pain once again on March 1, 2015. (AR 333). The hospital records indicate that Plaintiff had been binge drinking "for the last 10 days." (Id.). Test results showed that Plaintiff's condition was stable. (AR 326). However, Plaintiff remained at the hospital for several days so he could be monitored for alcohol withdrawal symptoms. (Id.). During his stay, Plaintiff reported that he "drinks alcohol almost on a daily basis" and smokes one-half to one pack of cigarettes daily. (AR 341). Plaintiff also reported that "he does not see his physician on any regular basis." (Id.). "Over the course of his hospital stay, [Plaintiff's] clinical status remained stable." (AR 326). The doctor once again discussed the need for Plaintiff to quit smoking. (Id.).

Lastly, Plaintiff suffered from a hernia on April 1, 2015 and sought medical attention at Borrego Health. (AR 430). Health screening tests showed that his respiratory and cardiovascular function was normal. (AR 431). Plaintiff reported that he was an "every day smoker" but "[d]enied smoking cessation support." (Id.).

**2. Treatment For Degenerative Disc Of The Lumbar Spine**

Plaintiff first sought medical attention for back pain on April 8, 2013. (AR 299). Plaintiff visited certified physician's assistant Gregory Lancaster at Kerrigan Family Medical Group alleging that he has been suffering from back pain for the past 2 years. (Id.). Plaintiff reported that it is difficult for him to

get up from a chair and the pain radiates to his thighs. (Id.).
Mr. Lancaster observed that Plaintiff was "unable to stand long
periods of time or lift over 15 pounds." (AR 301). Mr. Lancaster
prescribed Norco to Plaintiff and required Plaintiff to have an x-
ray performed in order to obtain a refill. (Id.).

Four days later, on April 12, 2013, Plaintiff had an x-ray
performed at Desert Medical Imaging. (AR 302). The x-ray results
showed that Plaintiff had "satisfactory vertebral body alignment"
along with "advanced multilevel disc degeneration and spondylosis
deformans accelerated for age." (Id.). Plaintiff also suffered
from "concave deformation of the superior endplate of the L5
vertebral body" and "facet arrhropathy at L4-5 and L5-S1." (Id.).
However, the paraspinous soft tissues are normal. (Id.).

Mr. Lancaster, who appears to be a physician's assistant,
completed a physical ability form on April 29, 2014. (AR 312-18).
Mr. Lancaster opined that Plaintiff can lift and carry up to 10
pounds continuously and 11-20 pounds occasionally. (AR 312). Mr.
Lancaster further opined that without interruption, Plaintiff can
sit for 2 hours, stand for 1 hour and walk for 45 minutes. (AR
313). In Mr. Lancaster's opinion, in an 8-hour day, Plaintiff can
sit for a total of 4 hours, stand for a total of 2 hours, and walk
for a total of 2 hours. (Id.). According to Mr. Lancaster,
Plaintiff is medically required to use a cane and he can walk only
50 yards without a cane. (Id.). With regard to postural
activities, Mr. Lancaster opines that Plaintiff can never climb
stairs and ramps, climb ladders and scaffolds, stoop, kneel, or

crouch. (AR 315). Plaintiff can balance occasionally and crawl frequently. (Id.). Mr. Lancaster also opines that Plaintiff cannot walk a block on rough or uneven surfaces. (AR 317). Mr. Lancaster based his opinion for each of the determinations above on the same few medical and clinical findings: "L-spine tenderness, unsteady gait, pain in low back . . . L2-S1 spondylosis. History of unable to lift >20 pounds, reach overhead, reach/push/pull, and has difficulty [with] balance." (See AR 312 – 15, 317) (listing the medical and clinical findings in Section I and citing "As in Section I" in remaining sections).

Finally, Mr. Lancaster opined that Plaintiff can never tolerate exposure to unprotected heights and moving mechanical parts, and that he can only occasionally tolerate exposure to extreme heat, dust, odors, fumes, and pulmonary irritants. (AR 316). Mr. Lancaster based his opinion on the reason that Plaintiff "[h]as COPD – cannot tolerate inhaled irritants." (Id.).

Plaintiff had another x-ray performed on May 1, 2014 at Desert Advanced Imaging Palm Springs. (AR 320). The x-ray results presented the following:

> Lumbar alignment is within normal limits. There is moderate multilevel degenerative disease normal lumber levels L1 through L5 with disc space narrowing and marginal spur formation. Minimal superior endplate deformity compression and L2-L4 and L5 may be the result of previous old trauma. There is arthritic disease in

8

facet joints at L3, L4, and L5.  Sacroiliac joints within

normal limits.  Paraspinous soft tissues unremarkable.

(Id.).

On November 4, 2014, Plaintiff visited Borrego Health requesting a medication refill for the hydrocodone-acetaminophen. (AR 433).  Plaintiff reported that he has had chronic back pain for the past six years, or since 2008.  (Id.).  A physical exam indicated that that Plaintiff's musculoskeletal system was normal. (AR 434).  However, the examiner noted that Plaintiff had back pain and limited range of motion.  (Id.).  When Plaintiff visited Borrego Health on April 1, 2015 for a hernia, the physical test indicated that his symptoms had improved. (AR 431) (physical test indicating Plaintiff's musculoskeletal system was normal and that he had a normal range of motion).

**B.    Medical Opinion Of Consultative Examiner**

At the request of the Agency, consultative examiner Vicente Bernabe, D.O., performed a complete orthopedic consultation of Plaintiff on November 13, 2013. (AR 305-09).  Plaintiff complained of lower back pain and reported that the pain began developing in May 2011.  (AR 305).  He described the pain as sharp, throbbing pain in his back, which is exacerbated by prolonged standing, walking, bending, and lifting, causing occasional numbness and tingling in his legs.  (Id.).  Dr. Bernabe noted that Plaintiff never "received any physical therapy or chiropractic treatment.  He

did not receive any cortisone injections or surgical intervention. He does not wear a brace for support. He does not use a cane to ambulate." (Id.). Dr. Bernabe observed that Plaintiff drove himself to the clinic and that he "moved freely in and out of the office and around the examination room without the use of any assistive device." (AR 306). Plaintiff's gait was normal and he was able to toe and heel walk. (Id.). Plaintiff "denie[d] any history of alcohol use" and reported that he "smokes eight cigarettes per day." (Id.).

Dr. Bernabe's physical examination further indicated that Plaintiff's spine was largely normal. (AR 306-07). In particular, his "cervical spine revealed normal attitude and posture of the head" and his "[r]ange of motion was full and painless." (AR 306). "The inspection of the thoracic spine was unrevealing." (AR 307). Plaintiff's lumbar spine had a "normal lordotic curve." (Id.). However, "[t]here was tenderness at the thoracolumbar and lumbosacral junction. There was paravertebral muscle spasm on the right" (Id.). An examination of Plaintiff's range of motion revealed "flexion of 40 degrees, extension of 15 degrees, side bending of 15 degrees to the left and right, and rotation of 45 degrees to the left and right." (Id.). Further, the straight leg raise test yielded negative results. (Id.).

Based on this examination, Dr. Bernabe diagnosed Plaintiff with degenerative disc disease of the lumbar spine and lumbar musculoligamentous strain. (AR 308). Dr. Bernabe opined that Plaintiff is able to walk, stand and sit for 6 hours out of an 8-

hour day, lift and carry 50 pounds occasionally and 25 pounds frequently, and push and pull without limitations. (AR 308-09). Dr. Bernabe opined that Plaintiff did not have any restrictions to agility and postural movements. (AR 309). Further he did not note any impairment in hand use or fine fingering manipulation. (Id.). Dr. Bernabe's opinion is that Plaintiff does not need an assistive device. (Id.).

**C.   Non-examining Physicians' Opinions**

   **1.   Haaland M.D.**

   On November 22, 2013, State agency non-examining medical consultant Dr. Haaland, M.D., reviewed Plaintiff's medical records on the initial level. (AR 52-60). Dr. Haaland determined that Plaintiff was not disabled. (AR 50, 59). Dr. Haaland found that Plaintiff had "minimal MER [medical evidence of record] to support his allegations of disability." (AR 46, 55). In particular, Dr. Haaland noted that Plaintiff has "[n]o MER regarding a-fib" and "[h]e has restriction of spinal ROM [range of motion] on one exam." (Id.). On November 11, 2013, Dr. Haaland called Plaintiff to ask about his atrial fibrillation. (AR 45, 54). Plaintiff reported that "he has not had any issues with [his atrial fibrillation] and that his [doctors] have told him that it is fine with the medications he is taking." (Id.).

   Dr. Haaland requested the orthopedic consultative examination with Dr. Bernabe to obtain additional information about Plaintiff's

back pain.  (Id.).  Dr. Haaland found the results of Dr. Bernabe's orthopedic consultation "quite benign." (AR 56).  Dr. Haaland also observed that Dr. Bernabe's test results were not consistent with Mr. Lancaster's exam but noted that Mr. Lancaster's exam was "not a true objective finding anyway."  (Id.).  Based on the above information, Dr. Haaland found Plaintiff was partially credible.  (Id.).

Dr. Haaland found that one or more of Plaintiff's medically determinable impairments could reasonably be expected to produce his pain or other symptoms.  (AR 56).  He also found there was substantiation for Plaintiff's claims about the intensity, persistence and functionally limiting effects of his impairments.  (Id.).  Dr. Haaland gave significant weight to Dr. Bernabe's evaluation and opined that Plaintiff can perform medium work, stand, walk and sit for 6 hours in an 8-hour day, carry and lift 50 pounds occasionally and 25 pounds frequently.  (AR 48, 57).  Dr. Haaland concluded that although Plaintiff's "condition results in some limitations in [his] ability to perform work related activities," he had the residual function capacity ("RFC") to perform his past relevant work as a route drive."  (AR 50, 59).

**2.  Subin, M.D.**

Dr. Subin,.M.D., the State agency medical consultant on reconsideration, found Plaintiff "not disabled" On January 21, 2014.  (AR 71, 80).  Dr. Subin agreed with Dr. Haaland's determinations and found that although Plaintiff was limited in

12

his ability to perform certain work activities, he had the RFC to perform his past relevant work as a route driver.  (Id.).

### 3.  Minh D. Vu, M.D.

Following a request from the ALJ, medical expert Dr. Minh D. Vu, M.D., reviewed Plaintiff's medical records.  (AR 442-44).  Dr. Vu opined that the medical records established Plaintiff had physical impairments.  (AR 442).  However, Dr. Vu found that Plaintiff's impairments did not rise to the level of medically determinable impairments.  (AR 444).  Plaintiff's "cardiac function is essentially normal" and his seizures are infrequent.  (Id.).  Dr. Vu also opined that Plaintiff is not disabled because of his back pain since there is no significant neuromuscular deficiency.  (AR 443).  Based on these findings, Dr. Vu opined that "a medium RFC is in order."  (AR 444).

### D.  Vocational Expert Testimony

Vocational Expert ("VE") Dr. Luis Mas testified at Plaintiff's ALJ hearing regarding the existence of jobs that Plaintiff could perform given his functional limitations.  (AR 38-39).  The VE identified regional sales representative, warehouse manager, and route driver as Plaintiff's past relevant work.  (AR 39).

The ALJ posed one hypothetical to the vocational expert.  The ALJ described an individual with claimant's age, education, and prior work experience.  (Id.).  The individual would be restricted

to "medium" work, occasional stooping, occasional ladders, ropes or scaffolds, [and] otherwise frequent postural" activity. (Id.). The VE opined that such an individual could work as a regional sales representative and route driver. (Id.). The VE opined that there were no transferrable skills to light work. (Id.).

**E.** **Plaintiff's Testimony**

Plaintiff testified at the ALJ Hearing. Plaintiff stated that he did not finish high school, but obtained a GED. (AR 30). In the past 15 years, Plaintiff worked as a regional sales representative, route driver, and warehouse manager. (Id.). His disability began on June 1, 2012 and that was when he last worked. (Id.). Around that time, his wife had a stroke so he took six weeks off to care for her. (Id.). On August 11, 2012, he returned to work but "was laid off for lack of work in [his] position." (Id.).

Plaintiff stated that some of his symptoms of his heart condition prevent him from working. (AR 34). In particular, he is prevented from working because of "chest pains, palpitations, numbness in [his] upper chest quadrant, [his] upper quadrants . . . just the constant chest pains." (Id.).

Plaintiff also testified that he cannot work because of his back pain. (AR 30). He had back pain while employed but still reported to work. (Id.). His back pain has gotten worse since he was laid off. (AR 31). Plaintiff has difficulty sitting, standing

14

and walking.  (Id.).  He is "still able to function around the kitchen."  (Id.)  He does his "own laundry and takes care of [his] wife."  (Id.).  However, he cannot play golf anymore.  (Id.).  Plaintiff can carry 20 pounds at most, stand for 20 minutes without taking a break, sit for about 1 hour without taking a break, and walk continuously for about 200 – 300 yards.  (AR 32).  Because of his back condition, Plaintiff has numbness in his feet.  (AR 33).  Plaintiff has to lay down 2 to 3 hours a day because of his back pain.  (Id.).  He also developed a hernia which also causes him pain when coughing or sneezing or doing "anything strenuous."  (AR 35).  The hernia bulges out if he has "to lift up a 20-pound dog."  (Id.).

Plaintiff described some of his daily activities.  Plaintiff walks his dog in the mornings for about 150 yards in each direction.  (AR 36).  He will prepare breakfast or lunch.  (Id.).  He does some light dusting, but he does not do any vacuuming, yard work, or work in his garage.  (AR 37).  Plaintiff sits or reclines for the majority of the day.  (AR 36).

**IV.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not under a disability within the meaning of the Social Security Act from his disability onset date of June 1, 2012, through the date of the decision, July 23, 2015.  (AR 14).  At step one, the ALJ found that Plaintiff had not engaged

15

in substantial gainful employment since June 1, 2012, the alleged onset date. (AR 15). At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, atrial fibrillation, obesity, chronic obstructive pulmonary disease, hypertension, congestive heart failure, hernia, history of seizures, and alcoholism. (AR 15-16).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (AR 16).[2] The ALJ observed that "[n]o physician of record has opined that [Plaintiff's] impairments satisfy a listing." (Id.). Specifically, the State agency medical consultants and the medical expert all determined that Plaintiff's "impairments did not satisfy any listed criteria." (Id.). The ALJ gave great weight to medical expert Dr. Vu's opinion, and noted that Dr. Vu opined that

> [Plaintiff] did not meet/equal 11.02 in the absence of
> EEG and of documented frequency and severity of seizure
> attacks. Dr. Vu opined that the [Plaintiff] did not
> meet/equal listing 1.04 for spinal impairment, not
> having significant neuromuscular deficiency. Finally,
> Dr. Vu opined that the [Plaintiff] did not meet/equal

---

[2]    A physical or mental impairment is considered "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520.

listing 4.00 because his left ventricle ejection fraction was normal and his chest pain was not of ischemic nature.

(AR 16-17). The ALJ noted that Plaintiff has moderate multilevel degenerative disc disease, but there is "no evidence of compromise of a nerve root or spinal cord and no inability to ambulate effectively." (AR 17) (citations to the record omitted).

The ALJ then found that Plaintiff had the RFC "to perform the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c)." (Id.). The ALJ also found that Plaintiff "can occasionally stoop and climb ladders, ropes, and scaffolds," and "frequently perform all other postural activity." (Id.). In reaching this finding, the ALJ stated that he had considered all of Plaintiff's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529 and 416.929 and Social Security Rulings ("SSRs") 96-4p and 96-7p. (Id.). The ALJ also considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p (Id.).

The ALJ found that Plaintiff's subjective allegations regarding the intensity, persistence and limiting effects of his symptoms were "less than fully credible." (AR 18). The ALJ considered all the factors set forth in 20 C.F.R. 404,1529, 416.929 and SSR 96-7p to assess Plaintiff's credibility. (Id.). The ALJ

emphasized that Plaintiff's allegations are "out of proportion with the medical evidence and the record as a whole." (Id.).

In terms of Plaintiff's physical complaints, the ALJ explained that although Plaintiff has lumbar spine degenerative disc disease, Plaintiff "has merely received routine and conservative medical treatment with pain medications" not reaching the "amount of pain medication typical of an individual with disabling pain levels." (AR 18). Plaintiff did not report "treatment with physical therapy, chiropractic adjustments, cortisone injections, or the use of a cane to ambulate, or a back brace." (Id.). The ALJ noted that Plaintiff did not require "surgery or frequent hospitalizations" or require an assistive device to ambulate. (Id.).

The ALJ specifically noted that Plaintiff's allegations were inconsistent with the findings of the consultative examining doctor, Dr. Bernabe. (Id.). The results of Dr. Bernabe's orthopedic consultation were "unremarkable." (Id.). Dr. Bernabe reported

> that [Plaintiff] was in no apparent acute or chronic distress and he moved freely in and out of the office and around the examination room without the use of any assistive device. He drove himself to the examination. His gait was normal without ataxia or antalgia and he was able to toe and heel walk. His lumbar spine revealed

a normal lordotic curve and the pelvis was level. He

had tenderness and paravertebral spasm on the right.

(Id.) (citations to the record omitted). There was some limitation in Plaintiff's range of motion, but the straight leg-raising test was negative. (Id.). Dr. Bernabe did not note any other limitations.

The ALJ also observed that Plaintiff's allegations were inconsistent with the findings of the medical expert, Dr. Vu. (AR 19). Specifically, Dr. Vu noted that there was "no neuro-muscular deficits." (Id.). Plaintiff had a "normal range of motion, normal neurological exam, and normal carnial nerves." (Id.). Further, "the orthopedic examination was negative with full range of motion of the neck and thoracic spine, negative straight leg raising, full range of motion of the joints, and grip strength of 100lbs left and right." (Id.).

The ALJ gave little weight to Mr. Lancaster's opinion. (Id.). The ALJ noted that "Mr. Lancaster is a physician's assistant who completed a physical ability form." (Id.). However, "[t]here are no progress notes or a narrative statement to support Mr. Lancaster's opinion." (Id.). The ALJ found "no support in the record" for Mr. Lancaster's findings. (Id.). The ALJ emphasized that "Mr. Lancaster's opinion is inconsistent with the record as a whole including the opinion evidence from the State agency medical consultants, Dr. Bernabe, and Dr. Vu." (Id.).

With regard to Plaintiff's COPD, hypertension, and atrial fibrillation, the ALJ observed that these impairments "are stable and adequately controlled with medications." (AR 18). The ALJ also noted that Plaintiff "continues to smoke despite his COPD impairment." (AR 19). The ALJ gave great weight to Dr. Vu's opinion. (Id.). Dr. Vu found that Plaintiff's "cardiac function was essentially normal." (Id.). Dr. Vu reasoned that Plaintiff's "chest pain was non-ischemic and his ejection fraction as normal, while his atrial fibrillation did not result in syncope or shortness of breath." (Id.). Further, Plaintiff's seizures were not a medically determinable impairment" due to the infrequency and severity. (Id.).

At step four, the ALJ determined that Plaintiff was capable of performing his past relevant work as a regional salesperson and route driver. (AR 20). Therefore, the ALJ found that Plaintiff was not under a disability as defined by 20 C.F.R. 404.1520(f). (Id.).

**V.**

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. "The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett v. Apfel, 180 F.3d 1094, 1097)

(9th Cir. 1999); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)). However, the court must "affirm the denial of disability benefits if it is supported by substantial evidence and the Commissioner applied the correct legal standards." Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998)(citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." (Id.). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

**VI.**

**DISCUSSION**

Plaintiff challenges the ALJ's decision on the ground that the ALJ improperly rejected Plaintiff's credibility. (Memorandum in Support of Complaint ("MSC"), Dkt. No. 24, at 2, 4). Plaintiff

contends that the ALJ "failed to articulate specific and legitimate reason much less clear and convincing reasons in rejecting [Plaintiff's] credible testimony." (Id. at 3).

The Court disagrees with this contention. The ALJ provided clear and convincing reasons, supported by substantial evidence, for rejecting Plaintiff's testimony. Accordingly, for the reasons discussed below, the ALJ's decision must be AFFIRMED.

**A.** **The ALJ Offered Clear And Convincing Reasons Supported By Substantial Evidence For Finding The Subjective Evidence Less Than Fully Credible**

Plaintiff contends that the ALJ erred by failing to articulate clear and convincing reasons for finding Plaintiff's subjective testimony less than fully credible. (MSC at 3). The Court disagrees. The ALJ's decision contains extensive citation to and discussion of substantial evidence supporting his credibility findings.

When assessing a claimant's credibility, the ALJ must engage in a two-step analysis. Trevizo v. Berryhill, __ F.3d __, 2017 WL 2925434, *9 (9th Cir. July 10, 2017) (citing Garrison v. Colvin, 759 F.3d 995, 1014-15 (9th Cir. 2014)). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. (Id.). "If such evidence exists and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only

by offering specific, clear and convincing reasons for doing so."
(Id.). During this inquiry, the ALJ may use "ordinary techniques
of credibility evaluation, such as . . . prior inconsistent
statements." Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014)
(quoting Smolen, 80 F.3d at 1284). The ALJ may also consider any
inconsistencies in the claimant's conduct and any inadequately
explained or unexplained failure to pursue or follow treatment.
Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).

Here, at the first stage of his credibility analysis, the ALJ
found that Plaintiff's medically determinable impairments could
reasonably be expected to cause the alleged symptoms. (AR 18).
At the second stage, however, the ALJ found ample evidence that
Plaintiff's account of the intensity, persistence and limiting
effects of his symptoms was not fully credible. (Id.).

Plaintiff contends that the ALJ relied solely on objective
medical evidence to discount Plaintiff's credibility. (MSC at 6).
Defendant argues "the ALJ appropriately considered four legally
valid credible factors" for dismissing Plaintiff's testimony.
(Memorandum in Support of Defendant's Answer, Dkt. No. 25, at 3).
According to Defendant, one factor is "the fact that Plaintiff
stopped working for reasons unrelated to his disability." (Id.).
The Court disagrees with Defendant on this point. The ALJ did not
give this reason for rejecting Plaintiff's testimony. (See AR 18-
19). The ALJ merely states that "[s]ince being laid off
[Plaintiff's] conditions have worsened." (AR 17). This Court is
"constrained to review the reasons the ALJ asserts." Burrell v.

Colvin, 775 F.3d 1133, 1141 (9th. Cir. 2014).  Because the ALJ did clearly assert it as a reason for discrediting Plaintiff's testimony, the Court exercises its discretion to rely on other grounds to affirm the ALJ's decision.

The Court finds that the ALJ provided sufficient clear and convincing reasons, other than Plaintiff's termination from employment, to discount Plaintiff's testimony.  Specifically, the Court recognizes four reasons the ALJ provided for rejecting Plaintiff's statements.  (AR 17).  First, Plaintiff failed to follow basic treatment.  (AR 18).  Second, Plaintiff received only routine and conservative treatment.  (Id.).  Third, Plaintiff's conduct was inconsistent with the severity of the symptoms he alleged.  (Id.).  Fourth, Plaintiff's testimony regarding his symptoms are inconsistent with the medical evidence and the record as a whole.  (AR 18-19).

## 1.   Plaintiff Failed To Follow Basic Treatment Advice To Quit Smoking

First, the ALJ relied on Plaintiff's failure to follow basic treatment when evaluating Plaintiff's credibility.  "A claimant's subjective symptom testimony may be undermined by an unexplained, or inadequately explained, failure to ... follow a prescribed course of treatment."  Trevizo, 2017 WL 2925434, at *10 (citations omitted).  Failure to assert a reason for not following treatment "can cast doubt on the sincerity of the claimant's pain testimony."  (Id.).

In _Trevizo_, the court found that the ALJ did not provide clear and convincing reasons for rejecting credibility when relying on two instances of the claimant failing to take her medication as a reason to discount her testimony. First, the claimant was prescribed narcotics for pain but she did not take them because of a fear of becoming addicted. (_Id._). Second, the claimant was noncompliant with taking her diabetes medication because she feared that the medication was causing severe rashes. (_Id._ at *11). The claimant also indicated that there were periods in which she could not afford her diabetes medication. (_Id._). The court held that the claimant provided adequate explanations in both instances. Therefore, the claimant's noncompliance was not "clear and convincing" evidence for rejecting her testimony. (_Id._ at *10-11).

Here, there is substantial evidence in the record to show that Plaintiff failed to follow basic treatment advice. However, unlike the claimant in _Trevizo_, Plaintiff did not provide any explanation for his noncompliance. The ALJ specifically noted that Plaintiff continues to smoke despite having COPD. (AR 18). The record shows that Plaintiff's doctors repeatedly advised him to quit smoking. (_See e.g._, AR 329, 334, 346). In at least one instance, Plaintiff refused assistance with smoking cessation. (AR 431). The record also reflects that Plaintiff failed to quit drinking despite his doctors repeatedly advised him to quit. (_See e.g._, AR 331, 334, 346). Plaintiff does not provide any explanation, let alone an adequate one, for his failure to quit smoking and drinking. Therefore, Plaintiff's failure to follow basic treatment advice,

i.e., to quit smoking, is a clear and convincing reason to reject his testimony.

### 2. Plaintiff Received Only Routine And Conservative Treatment

Second, the ALJ discredited Plaintiff's testimony because "he merely received routine and conservative medical treatment with pain medications." (AR 18). "A conservative course of treatment can undermine allegations of debilitating pain." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) (citation omitted). However, it is "not a proper basis for rejecting the claimant's credibility where the claimant has good reason for not seeking more aggressive treatment." (Id.).

The Court agrees that there is substantial evidence in the record indicating that Plaintiff received routine and conservative medical treatment. The ALJ specifically noted that Plaintiff treated his back pain with only pain medications and the amount of medication does not rise to the level typical for an individual with disabling pain. (AR 18). The ALJ further observed that Plaintiff did not require or seek "physical therapy, chiropractic adjustments, [or] cortisone injections." (Id.). Plaintiff did not require the use of an assistive device for ambulation or a back brace. (Id.). He also did not require surgery or frequent hospitalization. (Id.).

Indeed, the record indicates that other than to refill his pain medication (or for an examination related to his request for benefits), Plaintiff visited a medical professional only three times for his back pain since the alleged onset date of June 1, 2012. Significantly, only one visit was for an examination. (See AR 299). The other two visits were merely for x-rays. (See AR 302, 320); (see also Trevizo, 2017 WL2925434 at *2-3 (the record reflected claimant underwent multiple surgeries, had at least twenty-two medical visits with her primary care physician over the course of four years, at least twenty-two medical visits with two different specialists, and "notably" failed multiple treatments)). Plaintiff fails to explain why he did not seek more aggressive treatment. Therefore, the Court finds Plaintiff's routine and conservative treatment is a clear and convincing reason for the ALJ to reject Plaintiff's testimony.

### 3. Inconsistent Conduct

Third, the ALJ cited to substantial evidence of Plaintiff's conduct that was inconsistent with the severity of the symptoms he alleged. See Molina, 674 F.3d at 1112 (ALJ may consider inconsistencies between the claimant's conduct and testimony to evaluate credibility). The ALJ specifically noted that during the visit to Dr. Bernabe's office, Plaintiff did not appear to be in "acute or chronic distress." (AR 18). Additionally, Plaintiff "moved around freely in and out of the office and around the examination room without the use of any assistive device." (Id.). He drove himself to the clinic and he was able to toe and heel

walk.  (Id.).  Plaintiff's demonstrated physical abilities are inconsistent with that of an individual with disabling pain. Therefore, Plaintiff's inconsistent conduct is another clear and convincing reason to reject Plaintiff's credibility.

### 4.    Plaintiff's Statements Regarding His Pain Were Not Supported By The Record

Finally, in addition to the reasons discussed above, the ALJ explained that he discredited Plaintiff's testimony because his statements are "out of proportion with the medical evidence and record as a whole."  (AR 18).  "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

#### a.    Atrial Fibrillation

Plaintiff listed his atrial fibrillation as a disability and testified that some of the symptoms of his heart condition prevent him from working.  (AR 34, 145).  The ALJ properly found that there is substantial evidence in the medical records to show that Plaintiff's COPD, hypertension, and atrial fibrillation are stable. (See e.g., AR 297-98) ("Atrial Flutter . . . Controlled," "[Plaintiff has history of] COPD that has been stable currently asymptomatic"); (see also AR 328) ("Chronic obstructive pulmonary disease, stable" "Congestive heart failure, stable" "Hypertension, stable"); (see also AR 431) ("Atrial fibrillation well-

controlled"). Furthermore, upon reviewing Plaintiff's medical records, medical expert Dr. Vu opined that Plaintiff's heart condition is essentially normal. (AR 443-44).

More notably, Plaintiff himself reported to the State agency consultant that he does not have any issues with his atrial fibrillation and it is "fine with the medication he is taking." (AR 45, 54); (see Ghanim, 763 F.3d at 1164 (ALJ did not err by discrediting claimant due to inconsistencies in testimony and previous statements.). Therefore, the ALJ properly found that Plaintiff's testimony regarding the limitations resulting from his atrial fibrillation were out of proportion with the record as a whole.

### b. Degenerative Lower Lumbar

Plaintiff also listed degenerative lower lumbar as a disability in his DIB and SSI applications. Plaintiff alleges an inability to bend, which causes him problems with tying his shoes, cutting his toenails, getting in and out of his truck, walking and standing. (See e.g., AR 152 ("I do not need help with in-home care, except for tying my shoes and cutting my toenails because I can't bend over.")); (see also, AR 219). Plaintiff also testified that due to his back pain he is limited to lifting at most 20 pounds, standing for 20 minutes uninterrupted, sitting for 1 hour uninterrupted, and walking 200-300 yards. (AR 32). However, this

testimony is inconsistent with nearly all medical evidence on the record, including the opinions of the State agency consultants, the consultative examiner, and the medical expert.

Dr. Haaland, the State agency consultant, concluded that Plaintiff is capable of medium work. (AR 47, 56). Specifically, Plaintiff is capable of bending at the waist occasionally; lifting and carrying 50 pounds occasionally and 20 pounds frequently; and standing, walking, and sitting for 6 hours in an 8-hour day. (AR 48, 57). Further, Dr. Haaland noted some limitations to Plaintiff's ability to climb and perform postural activity. (Id.). Dr. Subin, the State agency consultant on the reconsideration level agreed with all of Dr. Haaland's findings. (AR 67, 69, 76, 78).

Likewise, after performing a consultative exam, Dr. Bernabe reached similar conclusions regarding Plaintiff's physical ability. Dr. Bernabe found that Plaintiff can carry 50 pounds occasionally and 25 pounds frequently. (AR 308). Plaintiff is also able to walk, stand, and sit for 6 hours in an 8-hour day. (AR 309). Dr. Bernabe opined that Plaintiff did not have restrictions to postural movements. (Id.).

Dr. Vu, the medical expert, also had nearly identical findings. Dr. Vu opined that Plaintiff can lift and carry 50 pounds occasionally and 25 pounds frequently. (AR 444). Plaintiff can walk and stand for 2 hours at a time for a total of 6 hours in an 8-hour day, but Plaintiff was not limited in his sitting ability.

(Id.).  Dr. Vu noted some limitation in climbing, but not for postural activity. (Id.).

Mr. Lancaster's opinion is the only evidence that supports Plaintiff's contentions.  However, Mr. Lancaster's opinion is inconsistent with all other medical evidence on record, as described above.  Additionally, Mr. Lancaster's opinion even conflicts with Plaintiff's own testimony and conduct.  (AR 32) (Plaintiff testifying that he can walk about 200 to 300 yards without taking a break); (AR 36) (Plaintiff testifying that on an average day, he walks his dogs the mornings for a total of about 300 yards); (AR 306) (Plaintiff moved freely and walked without the use of a cane during the consultative exam).  Further, as the ALJ noted, "[t]here are no progress notes or a narrative statement to support Mr. Lancaster's opinion."  (AR 19).  Therefore, the Court agrees that Plaintiff's testimony was out of proportion with the record as a whole.  Again, this was a clear and convincing reason to reject Plaintiff's testimony.

1    In sum, the ALJ offered clear and convincing reasons supported

2 by substantial evidence for finding Plaintiff's subjective

3 testimony less than fully credible.

4

5                                **VII.**

6                            **CONCLUSION**

7

8    Consistent with the foregoing, IT IS ORDERED that Judgment be

9 entered AFFIRMING the decision of the Commissioner. The Clerk

10 of the Court shall serve copies of this Order and the Judgment on

11 counsel for both parties.

12

13 DATED:  July 31, 2017

14

15                              _____/S/_____

16                              SUZANNE H. SEGAL
                                UNITED STATES MAGISTRATE JUDGE

17

18 **THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS OR
ANY OTHER LEGAL DATABASE.**

19

20

21

22

23

24

25

26

27

28